## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| LISA POSTHUMUS LYONS | ) | |
| | ) | |
| Petitioner, | ) | Civil Case No. 1:22-mc-00107-PJG |
| | ) | |
| v. | ) | |
| | ) | |
| MY PILLOW, INC., and | ) | |
| MICHAEL LINDELL, | ) | |
| | ) | |
| Respondents. | ) | |

_____

### Defendants' Memorandum in Opposition to Plaintiffs' Motion to Quash Subpoena and for Sanctions
### Oral Argument Requested

**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (D.C. Bar No. 63279)*
Matthew Eslick (MN Bar No. 0388494)*
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
E-mail: parker@parkerdk.com

**TAYLOR LAW FIRM, PLLC**
Alexandria J. Taylor (P75271)
19 Clifford Street
Detroit, MI 48226
Telephone: (313) 960-4339
Email: ataylor@taylawfirm.com

*Counsel for Defendants*

# I.
# Introduction.

Michael Lindell and My Pillow, Inc. (collectively, "Defendants") are defending a lawsuit in which the plaintiffs ("Dominion") allege $1.3 billion in damages. A central issue in the lawsuit is the truth or probability of statements by Mr. Lindell that Dominion electronic voting equipment changed votes during the 2020 presidential election. To gather evidence probative of this issue, Defendants issued subpoenas to a sampling of counties that used Dominion equipment in the election, including Kent County ("Kent"). Defendants are willing to accommodate logistics-, timing-, cost-, and security-related concerns of the counties responding to these subpoenas, including Kent. In fact, Defendants have already made timing accommodations with other counties.

To defend themselves, Defendants have the right to gather the information requested by the Subpoena. Kent's objections are without merit.

# II.
# Factual and Procedural Background.

Dominion filed a complaint seeking $1.3 billion from Defendants, in federal court in the District of Columbia ("DC Action"). Parker Decl. ¶ 2 & Ex. A. Dominion alleged Mr. Lindell made statements that votes in the 2020 election were manipulated in electronic election equipment distributed by Dominion, through hacking by foreign countries and through the programming of the software on the

equipment. Dominion's complaint asserts claims of defamation and deceptive trade practice.

Kent uses Dominion products to conduct elections. Uzarski Decl. ¶ 6 (ECF No. 1-2). As part of discovery in the DC Action, Defendants served a subpoena ("Subpoena"), ECF No. 1-7, upon the Kent Clerk's Office. The Subpoena seeks information concerning the Dominion products Kent used in 2020. *Id.* The Subpoena was served on September 6, 2022, and requested compliance by September 30, 2022. Parker Decl. ¶ 3 & Ex. B; ECF 1-7, at 1. Defendants served similar subpoenas on thirty-seven other counties, each with a return date of September 30, 2022. Parker Decl. ¶ 14. In 2020, some of these counties reported a sizeable majority of votes for Joseph Biden, some reported a sizeable majority of votes for Donald Trump, and some reported close vote totals for both candidates. *Id.*

The information sought by the Subpoena to Kent directly relates to the claims in the DC Action. Dominion's D.C. complaint alleges the following statements were false:

- Operatives from foreign countries hacked into Dominion's machines and either flipped votes or miscounted votes to begin with.  Compl. ¶ 165(x), (y), (z) (Parker Decl. Ex. A).

- Dominion's machines calculated more than one vote for Joseph Biden and less than one vote for Donald Trump for each vote cast. Compl. ¶ 165(a), (b), (c), (e), (h), (i), (j) (k), (*l*), (m), (n), (o), (q), (w), (z), (aa).

2

- Dominion's machines stole "millions of votes."  Compl. ¶ 165(f), (h), (y).

- Dominion enabled or committed voter fraud and other crimes. Compl. ¶ 165(g), (h), (i), (j), (k), (l), (m), (n), (o), (p), (q), (s), (v), (y), (z).

Though not necessary for Defendants to prevail on this Motion, there is ample reason to infer that information from Dominion equipment used in the 2020 election will provide evidence concerning the truth or inherent probability of the statements placed at issue by Dominion's complaint.

- On June 3, 2022, the federal Cybersecurity & Infrastructure Security Agency issued a notice identifying nine security vulnerabilities in certain Dominion election equipment, which allowed an "attacker" to "install malicious code," "disguise malicious applications," "spread malicious code," "perform privileged actions," or "print an arbitrary number of ballots without authorization." *See* Parker Decl. ¶ 4 & Ex. C.

- On March 31, 2022, the federal Election Assistance Commission (EAC) published a report concerning a Dominion system used in Tennessee, describing an "anomaly" in which "[c]lose poll reports from 7 of the 18 ICP tabulators used during the [2021] election did not match the number of ballots scanned." Parker Decl. ¶ 5 & Ex. D at

2. Subsequent investigation "confirmed" the anomaly, but "the root cause . . . was not determined." *Id.* at 3. Later, an analysis by Dominion stated that "erroneous code is present in the EAC certified D-Suite 5.5-B and D-Suite 5.5-C systems" that caused ballots to be erroneously misread and not included in close poll report totals. *Id.* at 4.

• An IT security professional who reviewed a Dominion system from a Michigan county after the 2020 election found data indicating internet communications between that system and IP addresses in Taiwan and Germany. Parker Decl. ¶ 6 & Ex. E ¶ 9.

• A September 2022 lawsuit by Fulton County, Pennsylvania against Dominion alleges that a professional review of Fulton County's Dominion election system found "errors in the ballot scanning," "non-certified database tools," and "changes made to the EMS three weeks before the 2020 election." Parker Decl. ¶ 7 & Ex. F. The complaint alleges another analysis of the system found an unauthorized script installed after the certification date, which could "exploit and create any number of vulnerabilities including, external access to the system." *Id.* ¶¶ 70-71. The complaint alleges that log files on the

4

system showed an improper remote connection to an IP address in
Quebec, Canada. *Id*. ¶¶ 73-74.

- A May 2022 primary election in Dekalb County, Georgia returned
  results in which one candidate received zero votes in several precincts
  including her home precinct. *See* Parker Decl. ¶ 8 & Ex. G. Hand
  counting later showed this candidate won the election, rather than
  placing third as initially reported, and had been "shortchanged by
  3,792 votes." *Id*. The county attributed the problems to "a computer
  programming error." *Id*. Dominion provides electronic voting systems
  statewide in Georgia. Parker Decl.

- During the 2020 election in Gwinnett County, Georgia, 1,642 ballots
  were initially not counted "even after Dominion made real time
  software changes," according to a federal court declaration from an
  election observer. Parker Decl. ¶ 9 & Ex. H. The observer concluded
  that "vote count discrepancies created by the batch management
  software problem were significant enough to change the result of the
  presidential election" and a "hand count audit . . . [instead] showed
  President Biden with [the] highest number of votes." *Id*. ¶ 19.

- The CEO of Konnech, Inc. was charged by Los Angeles prosecutors
  with allegedly storing personal information of thousands of U.S.

election workers on servers located in China, contrary to Konnech's

legal obligations and its own representations. Parker Decl. ¶ 10 & Ex.

I. Konnech provides election equipment to counties throughout the

United States. *Id.*

On September 9, 2022, Kent wrote to Defendants' counsel and claimed that

the Subpoena requested "production of voluminous materials which would impose

a considerable burden" on Kent. ECF No. 1-9. Kent offered no explanation of how

the materials were "voluminous," nor any description of why the burden associated

with compliance would be "considerable." Kent wrote again on September 16,

2022, claiming that compliance would be "unduly burdensome" solely because the

information sought was "largely or entirely irrelevant," and "not reasonably

limited." ECF No. 1-10. Kent neither explained why it believed the Subpoena was

irrelevant nor identified any other basis for its claim that the Subpoena was unduly

burdensome.

On September 21, 2022, Defendants' counsel responded to Kent, explaining

that Kent was one of several recipients of similar subpoenas and that Defendants

***did not*** intend to move to compel compliance with the Subpoena until after

analyzing information received in response to the other subpoenas. ECF No. 1-11.

That is, Kent was told it need take no further action, and Defendants would not

attempt to compel production until further discussions occurred.

6

Kent waited until the response date on the Subpoena passed and then brought the instant Motion on October 4, 2022. Kent did not at that time notify Defendants of the Motion. Media coverage ensued. *See, e.g.*, Craig Mauger, *Kent County Clerk Asks Court to Quash Subpoena from MyPillow CEO Mike Lindell*, Detroit Daily News (Oct. 5, 2022). Parker Decl. ¶ 11 & Ex. J.

On October 11, 2022, a week later, Kent's counsel finally sent Defendants' counsel notice of the Motion, emailing a request for waiver of service. Parker Decl. ¶ 12 & Ex. K. Defendants returned the signed waiver on October 17, 2022. Parker Decl. ¶ 13 & Ex. L.

Defendants have agreed to postpone the production date for similar subpoenas issued to other counties until after the 2022 election. Defendants have not yet filed a motion to compel compliance with any subpoena issued to a county in the DC Action. One other county, Monroe County, Florida, has filed a motion to quash the subpoena issued to it. Dominion has filed in the DC Action a motion seeking a protective order concerning Defendants' subpoenas to the counties, which Defendants opposed. The D.C. Court has not yet ruled on Dominion's motion.

### III.
### Argument.

Discovery is permitted into any matter "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Liberal discovery is provided for the sole

purpose of assisting in the preparation and trial, or settlement of, litigated disputes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). Because Kent has moved to prevent the requested discovery, Kent bears the burden of demonstrating why the discovery should not occur. *Tlusty v. United States*, 871 F. Supp. 299, 301 (E.D. Mich. 1994).

Kent makes three arguments to support its demand to quash the Subpoena. It contends that the information sought is not relevant to the DC Action, that election security considerations preclude the discovery, and that the Subpoena is unduly burdensome. None of Kent's contentions have merit.

**A. Kent's Objections to the Subpoena Are Meritless.**

As an initial matter, Kent's Motion to Quash is procedurally precluded because Kent by its own account failed to timely object to the Subpoena. ECF No. 1-1, at 8 ("[T]he Clerk has not sent any" objections). An objection to a Subpoena "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). Kent County has waived any relevance, burden, or other objections it might otherwise have asserted.

Kent's substantive arguments concerning the Subpoena are no stronger. Kent claims the Subpoena is nothing more than an "arbitrary fishing expedition," and that Kent does not have "any information that is both relevant and which cannot be obtained from Dominion itself." Kent Br. at 3, 1 (ECF 1-1). Arguments

of this type face an uphill climb because "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Showing relevance is an 'extremely low bar.'" *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 569 F. Supp. 3d 626, 632 (E.D. Mich. 2021) (quoting *In re Ford Moto Co. Spark Plug & 3-Valve Engine Prods. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014)). As shown below, the information sought by the Subpoena is both highly relevant and proportional to the needs of the DC Action. It is, therefore, discoverable.

### 1.  The Subpoena Seeks Relevant Information.

The information sought by the Subpoena from and about Kent's Dominion election equipment is relevant to a central substantive issue in the DC Action – whether the reported results of the 2020 election were manipulated on Dominion election equipment.

Dominion, to prevail on its defamation claim, must prove Mr. Lindell's alleged statements regarding Dominion's products are false. *See Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017). Conversely, Defendants can prevail by showing the statements are substantially true or that they are not "inherently improbable." *See Armstrong v. Thompson*, 80 A.3d 177, 183-84 (D.C. App. 2013) (substantial truth defense to defamation claims); *St. Amant v. Thompson*, 390 U.S.

727, 732 (1968) (defamation plaintiff subject to "actual malice" standard must show the defamatory statements were either believed by the defendant to be false or were not made in good faith, which may be supported by evidence that the statements were "inherently improbable"). By claiming Mr. Lindell's statements were defamatory, Dominion placed at issue the truth and probability of the statements.

The statements alleged by Dominion to be false, described above, stated that Dominion machines were hacked or otherwise programmed to change votes during the 2020 election. The truth or the inherent probability of statements about election computers miscounting votes would be supported by evidence that Kent's Dominion election equipment contained unauthorized software, malware, or other forms of computer code to cause vote miscounting. The truth or the inherent probability of these statements would also be supported by evidence that any of Kent's equipment was subject to unauthorized access or programming changes.

The Subpoena seeks precisely this kind of evidence. The Subpoenas seek forensic images of any drive attached to or affiliated with an EMS Server. Subpoena Ex. A, at 5 ¶ 1(a). An "EMS" server is a server used by an "Election Management System or any set of electronic equipment used to facilitate the counting, tabulation, and reporting of results in a public election." Subpoena Ex. A, at 4 ¶ 8. The Subpoena also seeks images of certain other computer equipment,

data about the network system used by Kent to administer its elections, and other documents related to election equipment contracts, 2020 election results, or election equipment intrusion attempts. Subpoena Ex. A., at 5 ¶ 1(b)-(h), 6 ¶ 3. These materials can show instances of improper programming, security breaches, anomalous behavior of the equipment, or discussion of the same – all telltale indicators of vote miscounting.

Kent implicitly admits the relevance of the information sought by the Subpoena. Kent Elections Director Gerrid Uzarski states in his declaration that the Subpoena seeks information which, if it fell into the wrong hands, would allow "outside parties" to "gain access to Kent County's equipment *and manipulate our elections*." Uzarski Decl. ¶ 6 (emphasis added). This admission supports Defendants' position in the DC Action, and Defendants have the right to gather related information and explore how far this admission reaches – and whether a manipulation event already happened.

As set forth above, information from a variety of public sources supports the inference that the Subpoena will reveal evidence to support Defendants' defenses. Mr. Uzarski's Declaration further supports Defendants' pursuit of this information.

Defendants are entitled to use the tools of discovery to gather, in admissible form, relevant evidence from Kent.[1]

### 2.  The Subpoena Requests Are Proportional to the DC Action.

The second factor under Fed. R. Civ. P. 26(b)(1) considers whether information sought is "proportional to the needs of the case." To assess proportionality, the Court considers,

> the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the purported discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Each of these factors weighs in favor of the Subpoena.

- As discussed above, the Subpoena seeks facts to support election-related defenses central to the DC Action. The DC Action is in significant part *about* the evidence sought by the Subpoena, and these are matters of great public interest.

- The amount in controversy is more than $1.3 billion.

- Only Kent County possesses electronic data showing how Kent County's electronic voting machines functioned during the 2020 election.

---

[1] Kent incorrectly claims the Subpoena requires it to produce irrelevant documents such as "campaign finance inquiries." Kent Br. at 11. The Subpoena is directed to documents concerning "the results of the November 2020 Election." Subpoena at 3 ¶ 4(a), 2 ¶ 17 (ECF 1-7). Matters of "campaign finance" are not related to the "results" of the election.

- Kent County, a public entity, has sufficient resources to produce the requested information.

- The information sought could be dispositive in resolving claims in the DC Action.

- As shown below, the burden of the purported discovery is insignificant compared to the likely benefit.

The Subpoena is proportional under Rule 26.

### 3. The Subpoena Is Not Unduly Burdensome.

Kent's Motion raises only one of the Rule 26(b)(1) factors, asserting the Subpoena imposes an "undue burden." Kent Br. 8-11. Procedurally, Kent waived this objection by failing to assert it within the time required by Rule 45(d)(2)(B). Substantively, "[u]ndue burden is to be assessed in a case-by-case specific manner covering such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *New Prods. Corp. v. Dickinson Wright*, 890 F.3d 244, 251 (6th Cir. 2018) (quotation marks omitted). A court must "balance the need for discovery against the burden imposed on the person ordered to produce it." *Id.* As the party claiming undue burden, Kent must make a "specific showing . . . of why the demand is unreasonably burdensome." *State Farm Mut. Auto. Ins. Co. v. Elite Health Ctrs.*, 364 F. Supp. 3d

758, 766 (E.D. Mich. 2018) (quotation marks and citations omitted).  Simply

because "it will be either bothersome or burdensome to respond to a discovery

request does not necessarily mean that it will be *unduly*" so. *Id.*

      The fact that Kent is a government entity is not a reason to quash the

Subpoena. *See, e.g.*, *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 569 F. Supp.

3d 626, 634 (E.D. Mich. 2021) (government entities "are not" exempt from normal

discovery obligations). Nor is the fact that the Subpoena seeks electronic data. *Id.*

at 635 ("It is way too late in the day for lawyers to expect to catch a break on e-

discovery compliance because it is technically complex and resource-demanding")

(quotation omitted). None of the other reasons asserted by Kent for a supposed

undue burden stand up to scrutiny.

      <u>First</u>, Kent claims the Subpoena "threatens the Clerk's ability to ensure a fair

and accurate election on November 8, 2022." Kent Br. at 9. However, Kent can

copy, preserve, and securely store the data requested by the Subpoena, then

produce the data after the election. This procedure would address Kent's purported

concern about November 8. Copying the data on a computer drive is a simple

process that need not interfere with ordinary County operations. *See Covad*

*Communs. Co. v. Revonet, Inc.*, 258 F.R.D. 5, 10 (D.D.C. 2009) ("Creating a

forensic image is no more burdensome than using the server for everyday business

activities.").

Second, Kent claims the Subpoena would require Kent to replace its voting machines. Kent Br. 9-10. Not so. After producing the information sought by the Subpoena, Kent can, and should, change the passwords on its equipment – a routine cyber-security procedure. Changed passwords, along with other standard cyber-security procedures no doubt already employed by Kent, should place the County voting system, after production, in the same security position that it occupies today. If Kent's Dominion equipment is not secure against vote manipulation *even when the passwords are strong and kept secure*, then Kent has a security problem without regard to the Subpoena. The Subpoena seeks password information only as necessary to allow Defendants' experts to analyze the electronic data produced by Kent. Defendants do not ask for, and do not want, any password that would permit access to the actual Kent system post-production.

Third, Kent claims that producing information would "cost the faith Kent County residents have in the integrity of its election system." Kent Br. 10. To the extent that this assertion differs from the point addressed immediately above, it is unsupported and illogical. If the election system is secure, permitting outside review will confirm its security. If the system is not secure, then outside review will reveal issues that the County needs to address. If anything, the Kent Elections Director's sworn admission that the county's election equipment can be hacked to manipulate votes may have already caused voters to "lose confidence in the

15

system." *Id.* It is the system itself, not Defendants' discovery of information about it, that would be responsible for any loss of voter confidence.

Fourth, Kent claims the Subpoena is "insufficiently detailed such that Kent County could not determine which documents it was even requesting." Kent Br. at 11. Yet the declaration submitted by Kent's Elections Director purports to detail what is necessary to respond to the subpoena in terms of data, cost, and procedures. Uzarski Decl. ¶¶ 3-7. Given this declaration, Kent's claims that it does not know *how* to comply with the Subpoena fall flat. Kent further exhibits a basic lack of understanding concerning electronic discovery, stating that it does not understand what a "forensic image" is. *See* Kent Br. at 11 n.4. Forensic imaging of electronic devices is routine. "[F]orensic imaging is not uncommon in the course of civil discovery" and has been "not uncommon" for twenty-five years. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). The Sixth Circuit has recognized that this discovery method is available to "compel[] the forensic imaging and production" of computerized data. *Id.*

While Kent's brief does not discuss the cost of producing the information sought by the Subpoena, the Uzarski Declaration provides a purported cost "estimate." Uzarski Decl. ¶ 4. These figures – not provided to Defendants prior to the County's Motion – are almost certainly inflated, for Defendants are willing to discuss with Kent ways to focus the data collected – for example, by limiting the

scope of the requests to only certain county employees – if Defendants are provided information concerning the identity and responsibilities of relevant County employees. By bringing its unnecessary, premature Motion, Kent short-circuited the ordinary meet and confer process concerning the cost of compliance with the Subpoena.

Fifth, Kent incorrectly claims the Subpoena seeks information obtainable elsewhere. Kent Br. 11. No other person or entity, to Defendants' knowledge, possesses the stored data from *Kent's* electronic election equipment that was *used to count and report votes in the 2020 election*. The Subpoena seeks information that only Kent has.

Kent's Motion fails to carry its burden to show the Subpoena is unduly burdensome.

## B. Kent's Security Concerns Can Be Addressed with a Protective Order.

Kent's security-related arguments concerning the Subpoena can easily be addressed through entry of a protective order limiting access to any confidential information produced in response to the Subpoena. Protective orders are routine where confidential information or trade secrets are discoverable, and they may contain designations of who may view which information. *Dow Corning Corp. v. Jie Xaio*, 283 F.R.D. 353, 356 (E.D. Mich. 2012) (protective order can allow for

disclosure only to those involved in litigation or only to the attorneys representing parties in a litigation). Assuming at least some of information sought by the Subpoena would qualify as confidential or proprietary,[2] Kent still must produce the information. Federal courts and the attorneys practicing before them are well-accustomed to handling confidential and proprietary information in litigation. *See, e.g.*, Fed. R. Civ. P. 26(c)(1)(G).

In a footnote, Kent asserts that a protective order "is not an acceptable alternative." Kent Br. at 7 n.2. To support this assertion, Kent points to a newspaper article about election data in a different case that allegedly became public, says it "has no confidence that Lindell will honor a protective order," and speculates that "[i]f responsive information falls into the wrong hands, it is possible that someone could use the information to try to disrupt the security of the next election's votes." *Id*. at 10. These bare speculations are not a reason to preclude discovery. *See, e.g.*, *Pro-Football, Inc. v. Harjo*, 191 F. Supp. 2d 77, 80 n.1 (D.D.C. 2002) (rejecting "speculat[ion] that someone may violate" protective order as basis for shielding confidential documents from discovery);

---

[2] Kent provides no evidence of proprietary information other than a conclusory statement. *See* Uzarski Decl ¶¶ 6, 7. Conclusory statements are not sufficient to make the necessary showing that information should be protected. *E.g.*, *Tinman v. Blue Cross & Blue Shield*, 176 F. Supp. 2d 743, 745-46 (E.D. Mich. 2001).

*Delquin Plastics USA, Inc. v. Larach*, No. CV 16-5518-TJH, 2017 U.S. Dist.

LEXIS 216042, at *4 (C.D. Cal. Sep. 26, 2017) (ordering discovery of

competitively sensitive documents because "questions whether defense counsel

will abide by the protective order" were "purely speculative and unsupported by

any showing that defense counsel would violate a court order"); *Ferron v. Search*

*Cactus, L.L.C.*, No. 2:06-cv-327, 2007 U.S. Dist. LEXIS 50947, at *4 (S.D. Ohio

July 13, 2007) ("Defendant's assertions that it is likely that Plaintiff will disclose

confidential information and violate the protective order do[] not rise above

mere speculation").

　　　Kent does not provide any evidence that Defendants have ignored a

protective order applicable to them, or that they would do so here. Kent's

purported security-related concerns can be addressed with the entry of a protective

order that restricts the dissemination of confidential material.

## C. Sanctions Are Not Appropriate.

　　　Kent asks the Court to sanction Defendants for purportedly failing to comply

with Fed. R. Civ. P. 45(d)(1). Kent Br. _. The Court has discretion whether to

award attorney fees as a sanction. *United States v. 36695 Clarita*, No. 15-12679,

2015 U.S. Dist. LEXIS 143429, at *5 (E.D. Mich. Oct. 22, 2015).  Defendants

have met their obligation to "take reasonable steps to avoid imposing undue burden

or expense" under Rule 45(d)(1). The Subpoena seeks information that is relevant

19

and proportional to the claims and defenses in the DC Action, and Defendants have

taken generous steps to avoid imposing any undue burden on Kent. On September

21, 2022, over a week before Kent's response to the subpoena was due, counsel for

Defendants explained to Kent that Defendants did "not intend to bring any motion

to compel compliance with the subpoena until [counsel had] undertaken further

discussion with [Kent] regarding the subpoena topics and the objections." ECF 1-

11. Kent ignored this statement and instead rushed to the courthouse without

bothering to notify Defendants that its Motion had been filed until a week passed.

There is no basis for any sanction.

## IV.
## Conclusion.

Kent's Motion should be denied. At most, the Court should enter a

protective order permitting Kent to designate information as confidential, and

setting a date after the November 8, 2022, election as the time for Kent to produce

the information sought by the Subpoena – though responsive data must be

preserved now so that it can be produced later.

DATED:  October 31, 2022.　　　**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (D.C. Bar No. 63279)*
Matthew Eslick (MN Bar No. 0388494)*
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
parker@parkerdk.com

20

*To be admitted *Pro Hac Vice*
*Counsel for Defendants*


**TAYLOR LAW FIRM, PLLC**
Alexandria J. Taylor (P75271)
19 Clifford Street
Detroit, MI 48226
Telephone: (313) 960-4339
Email: ataylor@taylawfirm.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Matthew R. Eslick, certify that the foregoing memorandum complies with Local Rule 7.2(b)(i).

I further certify that I used Microsoft Word for Microsoft 365 MSO (Version 2209) and that this word processing program has been applied specifically to all text,  including headings, footnotes, citations, and quotations, but excluding the case caption, cover sheet, signature block, attachments, exhibits, and affidavits. *See* W.D. Mich. LR 7.2(b)(i). The foregoing document contains 4641 countable words.  *See* W.D. Mich. LR 7.2(b)(ii).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2022, I electronically filed the foregoing instrument with the Court using the ECF System which will send notification of such filing to counsel of record.


Respectfully submitted

By:   <u>/s/Alexandria J. Taylor</u>


Dated: October 31, 2022